**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tommy Ray Vinson,<br><br>          Plaintiff,<br><br>v.<br><br>General Motors LLC,<br><br>          Defendant. | No. CV-20-01077-PHX-SMB<br><br>**ORDER** |

Pending before the Court is Defendant General Motors LLC's ("GM") Motion for Summary Judgment ("Motion"). (Doc. 33.) The Motion is now fully briefed.[1] Neither party requested oral argument, and the Court declines to hold oral argument, finding that it is unnecessary. *See* LRCiv 7.2(f). The Court has reviewed the pleadings and relevant law and will grant the Motion for the reasons explained below.

**I.  BACKGROUND**

This case arises from the termination of Plaintiff, Mr. Vinson, from GM in February 2019. GM hired Plaintiff in March 2014 as a Senior Software Developer located in Georgia. (Doc. 34 ¶ 1.) Plaintiff was 44 years old when he was hired. (*Id.* ¶ 3.) In 2015, Plaintiff began experiencing problems with skin rashes and edema in his legs. (*Id.* ¶ 11.) To alleviate this edema, he would elevate his feet by putting them on his desk. (*Id.*)

On February 2, 2016, Plaintiff emailed HR Business Partner Lolita Fortenberry,

---

[1] After Plaintiff initially filed a Response, (Doc. 35), and GM its Reply, (Doc. 37), the Court allowed the Plaintiff to file an Amended Response, (Doc. 48), and GM an Amended Reply, (Doc. 49).

stating that he had a health issue he needed to discuss. (*Id.* ¶ 13.) Plaintiff informed Ms. Fortenberry that he had flare-ups which required him to apply cream to the majority of his body. (*Id.* ¶ 14.) He asked to use a private bathroom to apply the cream during working hours. (*Id.*) GM granted Plaintiff's request. (*Id.*) On May 19, 2016, Plaintiff email Ginger Schroeder, an HR supervisor, informing her of his medical condition and asking for time off to undergo treatment twice a week for three months. (*Id.* ¶ 16.) Again, GM granted his request, and Plaintiff was allowed time off to undergo treatment.

Around November 2016, Plaintiff was diagnosed with polycythemia vera, a medical condition where his body produces too many red blood cells. (*Id.* ¶ 18.) He again emailed Schroeder on November 4, 2016, informing her of the condition and asking how to identify as having a disability. (*Id.* ¶ 19.) Plaintiff did not request an accommodation at that time. (*Id.* ¶ 21.)

Plaintiff claims that, around March 2017, he received an email from an individual named JoEllen Boyd[2] stating that it was unprofessional for him to put his feet on his desk. (*Id.* ¶ 22.) Plaintiff responded to Boyd and Fortenberry that he required an accommodation which allowed him to elevate his feet because of his medical condition. (*Id.* ¶ 24.) At that time, no other employee—including Plaintiff's supervisor—had told Plaintiff he could not elevate his feet at work. (*Id.* ¶ 25.)

After receiving Plaintiff's email, Fortenberry referred Plaintiff to the site's medical director, Dr. Michelle Bruce, so he could undergo the formal accommodation request procedure. (*Id.* ¶ 26.) About two weeks later—still in March 2017—Plaintiff emailed Dr. Bruce advising her that he had been diagnosed with polycythemia vera and high blood pressure and asked whether she needed any documents for him to obtain an accommodation. (*Id.* ¶ 29.) Dr. Bruce responded the same day and asked that Plaintiff's medical provider supply her with documentation showing Plaintiff's actual diagnosis, specific treatment plan, and recommendation for medical accommodation. (*Id.* ¶ 30.)

On March 31, 2017, Plaintiff emailed Dr. Bruce a letter from his doctor stating that

---

[2] Ms. Boyd's role at GM is not clear from the briefing.

Plaintiff suffered from hypertension and intermittent fluid retention and asking that he be allowed "to elevate his feet at work as needed to keep his symptoms to a minimum." (*Id.* ¶¶ 31–32.) Dr. Bruce responded to Plaintiff's email and stated that the letter did not indicate the treatment intended to alleviate his medical condition. (*Id.* ¶ 33.) Thus, she asked that Plaintiff's doctor provide her with the medical treatment he was receiving. (*Id.* ¶ 34.) After receiving this email, Plaintiff decided that he would not pursue the accommodation process further and did not provide the requested documentation to Dr. Bruce. (*Id.* ¶ 36.) The parties dispute whether Plaintiff was ever prohibited from putting his feet up while working. (*Id.* ¶ 37; Doc. 48 at 8.) According to Plaintiff, any time he needed to put his feet up, he would take his laptop to an enclave, put his feet up, and continue working. (Doc. 34 ¶ 38.)

On April 26, 2018—over a year after Dr. Bruce requested additional documentation to support Plaintiff's accommodation request—Plaintiff emailed Dr. Bruce his recent medical records. (*Id.* ¶ 39.) Plaintiff's medical records indicated two diagnoses: secondary polycythemia and flushing. (*Id.* ¶ 40.) According to Dr. Bruce, the records also stated that Plaintiff was asymptomatic and identified his performance status as "0 – Fully active, able to carry on all pre[-]disease activities without restrictions." (*Id.*) Plaintiff disputes that the communication stated he was asymptomatic. (Doc. 48 at 8.) Based on the assessment by Plaintiff's doctors, Dr. Bruce responded to Plaintiff on April 27, 2018 stating that she could not approve his accommodation request because Plaintiff's medical records reflected that Plaintiff was asymptomatic and required no accommodation. (Doc. 34 ¶ 41.) Plaintiff did not respond to the email or ask for any other accommodation. (*Id.* ¶ 42.)

In June 2018, Plaintiff's supervisors approved his transfer to Arizona. (*Id.* ¶ 45.) Plaintiff's primary job in Arizona was to deploy the IBM DataPower solution for dealerships in Brazil, with the goal of rolling out the same solution in the U.S. and Canada if the project was successful. (*Id.* ¶ 48.) Plaintiff spent approximately 80% of his time working on that project while spending the remaining 20% of his time answering question from employees who took over his previous position. (*Id.* ¶ 49.) Undisputedly, the IBM

DataPower project on which Plaintiff was working did not go well. (*Id.* ¶ 50.)

In 2018, GM planned for a massive restructuring. (*Id.* ¶ 51.) The restructuring was related to a reduction in the demand for GM's vehicles, which required GM to massively cut costs. (*Id.* ¶ 52.) A supervisor at GM, Patrick Thompson, was tasked with identifying positions within GM to be eliminated. (*Id.* ¶ 53.) Thompson identified Plaintiff's position as one to be eliminated in approximately December 2018. (*Id.* ¶ 55.) GM's data showed that the IBM DataPower solution was not a successful project, and GM decided that the project would not be expanded as originally planned. (*Id.* ¶ 56.) Indeed, the IBM DataPower solution was never expanded to other countries besides Brazil and Mexico. (*Id.* ¶ 57.) Across GM's organization, there were approximately 8,914 IT employees in the United States. (*Id.* ¶ 61.) Of those, 5,127 were over the age of 40—approximately 57% of the IT employees. (*Id.*) GM released approximately 2,230 IT employees in the United States due to the reduction in force, 1,236 of which were over 40. (*Id.* ¶ 62.) Thus, about 55% of those IT employees laid off were over 40. (*Id.*)

Plaintiff testified that the first time he escalated any issues about his medical condition or accommodation request to Thompson was in March 2019, after his termination. (*Id.* ¶ 67.) Thompson was 54 when he made the decision to terminate Plaintiff's position. (*Id.* ¶ 74.)

Plaintiff brings three claims: (1) failure to provide a reasonable accommodation under the Americans with Disabilities Act ("ADA"); (2) termination based on disability in violation of ADA; and (3) termination based on age in violation of the Age Discrimination In Employment Act ("ADEA").

**II.   LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could

return a verdict for the non-moving party. *Id.* "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record" by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). The court need only consider the cited materials, but it may also consider any other materials in the record. *Id.* 56(c)(3). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the movant fails to carry its initial burden, the non-movant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). If the movant meets its initial responsibility, the burden then shifts to the non-movant to establish the existence of a genuine issue of material fact. *Id.* at 1103. The non-movant need not establish a material issue of fact conclusively in its favor, but it "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 247–48. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted). However, in the summary judgment context, the Court believes the non-movant's evidence, *id.* at 255, and construes all disputed facts in the light most favorable to the non-moving party, *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). If "the evidence yields conflicting inferences [regarding material facts], summary judgment is improper, and the action must proceed to trial." *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002).

## III. DISCUSSION

### A. Plaintiff's Evidence

To begin, GM in its Reply, asks the Court not to consider paragraphs 1–8 and paragraphs 10–18 of Plaintiff's Response because those paragraphs rely entirely on websites and documents that lack proper foundation and were not disclosed prior to Plaintiff filing his Response. (Doc. 49 at 2.) GM also asks the Court not to consider Exhibits 1, 3, 4, 6, and 10 for the same reasons. (*Id.*)

To assert that a fact is genuinely disputed, a party must support the assertion by "citing to particular parts of material in the record." Fed. R. Civ. P. 56(c)(1). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). Furthermore, "unauthenticated documents cannot be considered on a motion for summary judgment." *Id.* In opposing a motion for summary judgment, a party may not rely on evidence produced after the close of discovery. *Fallar v. Compuware Corp.*, 202 F. Supp. 2d 1067, 1079 (D. Ariz. 2002) (citing Fed. R. Civ. P. 37(c)). Citations to websites, without more, are not sufficient to support a factual contention on summary judgment. *See, e.g.*, *Prudential Ins. Co. of Am. v. Thomas*, No. CV-16-08171-PCT-JJT, 2018 WL 3586439, at *3 n. 3 (D. Ariz. July 26, 2018) ("A cite to 'Google Maps,' without more, is insufficient to support a factual contention at summary judgment."); *Ploof v. Ryan*, No. CV 13-0946-PHX-DGC, 2014 WL 3720542, at *6 (D. Ariz. July 28, 2014) ("Plaintiff's internet documents are insufficient.").

After reviewing Plaintiff's paragraph 1–8, 10–18, and Plaintiff's Exhibits 1, 3, 4, and 6, the Court agrees with GM that those paragraphs and exhibits are inadmissible and should not be considered. The paragraphs rely on information that Plaintiff apparently obtained from various websites. Plaintiff failed to disclose them in discovery before his filing his Response. Thus, the Court may not consider those paragraphs when ruling on GM's Motion. Exhibits 1, 3, 4, 6, appear to be unauthenticated screenshots taken from the internet. GM claims that they also were not disclosed during discovery. Therefore, the

Court will not consider these documents. Exhibit 10 contains images, seemingly taken from the internet, of similar medical conditions to those of the Plaintiff. He claims that the image at the bottom of Exhibit 10 is actually his own leg three months after treatment began. All images in the exhibit are unauthenticated, and GM claims that they were not disclosed in discovery. Thus, the Court will also not consider Exhibit 10. Moreover, even if the Court were to consider the paragraphs and exhibits cited above, they are of little relevance to the claims or defenses in this case. Accordingly, the Court will not consider them when ruling on this Motion for Summary Judgment.

### B. Plaintiff's ADA Claims

Title I of the ADA provides that no employer "shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a). An employer engages in unlawful discrimination under the ADA by "not making reasonable accommodations to known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A); *see Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018) ("The ADA treats the failure to provide a reasonable accommodation as an act of discrimination if the employee is a qualified individual."). An employer has an affirmative duty to engage in an interactive process with a disabled individual to identify reasonable accommodations. *See Dunlap v. Liberty Nat. Prods., Inc.*, 878 F.3d 794, 799 (9th Cir. 2017). Failure to do so constitutes unlawful discrimination under the ADA if a reasonable accommodation was possible. *See Snapp*, 889 F.3d at 1095.

To establish an ADA discrimination claim, a plaintiff must show that (1) he is disabled under the ADA; (2) he is a qualified individual, in that he can perform the essential functions of his job; and (3) the defendant failed to provide a requested reasonable accommodation, failed to engage in an interactive process to identify a possible reasonable

accommodation, or terminated him because of the disability.[3]  *See id.*; *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Sanders v. Arnesan Prods., Inc.*, 91 F.3d 1351, 1353 (9th Cir. 1996); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999); *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002); *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007).

General Motors LLC provides three independent arguments that justify a grant of summary judgment on Plaintiff's ADA claims: (1) Plaintiff is not disabled under the ADA; (2) GM engaged in an interactive process with Plaintiff; and (3) Plaintiff cannot show that he was terminated because of his medical condition or his accommodation request. (Doc. 37 at 2.) The Court finds GM's arguments persuasive.

### 1. Plaintiff did not prove he was disabled.

"To establish a claim under the ADA for failure to accommodate or discriminate, a plaintiff must first establish that he has a disability." *Sanchez v. United Parcel Serv. Inc.*, No. CV10-1586 PHX DGC, 2012 WL 5868769, at *1 (D. Ariz. Nov. 19, 2012). An individual is disability if he or she has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) [is] regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "[A] major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). Merely showing an impairment does not make a person disabled under the ADA. *See Hatcher v. Akash Hotels Int'l Inc.*, No. CV-20-02138-PHX-DWL, 2021 WL 5396088, at *4 (D. Ariz. Nov. 17,

---

[3] In the Ninth Circuit, "ADA discrimination claims under Title I must be evaluated under a but-for causation standard" that Plaintiff hardly comes close to satisfying. *Murray v. Mayo Clinic*, 934 F.3d 1101, 1107 (9th Cir. 2019).

2021) (rejecting the plaintiff's notion that dwarfism is an obvious disability).

Here, Plaintiff has not shown a disability that that substantially limits one or more of his life activities. Plaintiff does not specifically identify his alleged disability in response to the motion for summary judgment, but his arguments all relate to the swelling in his legs. He first reported suffering from a skin rash and swelling. A letter from Dr. Beth Simati says he has a history of hypertension and intermittent fluid retention. (Doc. 34-1 at 91.) GM's statement of facts says that he was diagnosed with polycythemia vera, a medical condition that results in his body producing too many red blood cells, in November 2016. There is no medical evidence presented as to what life activities are substantially limited by his condition. Accordingly, the Court finds that Plaintiff has not provided sufficient evidence to show that he was disabled under the ADA. This failure is fatal to both of Plaintiff's ADA claims. Nonetheless, the Court will undergo an analysis of GM's other arguments regarding the ADA claims.

### 2. GM engaged in the interactive process.

GM also argues that, even if Plaintiff had qualified for a disability under the ADA, his failure to accommodate claim still fails because GM complied with the interactive process and determined that his requested accommodation was not medically necessary. (Doc. 33 at 9.)

"[A]n employer is not required to provide a medically unnecessary accommodation." *Garcia v. Cintas Corp. No. 3*, 601 F. App'x 531, 532 (9th Cir. 2015). "An employer's knowledge of medical limitations is highly relevant in determining whether the employer provided a 'reasonable accommodation.'" *Gastelum v. Abbott Lab'ys*, No. CV 05-645 PHX NVW, 2006 WL 2456199, at *8 (D. Ariz. Aug. 22, 2006) (quoting *Gammage v. West Jasper Sch. Bd. of Educ.*, 179 F.3d 952, 955 (5th Cir. 1999)).

Here, the Court finds that even if Plaintiff was found disabled, GM sufficiently engaged in the interactive process and was justified in rejecting Plaintiff's request for accommodation. After Plaintiff informed Fortenberry that he required an accommodation, she referred him to the site's medical director, Dr. Bruce. Dr. Bruce lawfully requested

Plaintiff's medical records. Plaintiff initially provided some medical records in March 2017, but when Dr. Bruce pointed out that the medical records did not show that treatment initiated to relieve his condition, he failed to send her additional records until April 2018. According to Dr. Bruce's email and testimony, Plaintiff's doctor stated that Plaintiff was "able to carry out all pre[-]disease activities without restrictions." (Doc. 34-1 at 89.) On this basis, GM denied his request for accommodation. The denial of his request was justified because Plaintiff's medical records indicated that he was able to carry out all his activities without limitations. Plaintiff provided no further records to indicate that his request was needed. Accordingly, the Court finds that GM sufficiently engaged in the interactive process.

### 3. Plaintiff cannot show he was terminated because of his medical condition or accommodation request.

GM also argues that even if Plaintiff could state a claim under the ADA, GM's decision to terminate his position was unrelated to his disability or his accommodation request. (Doc. 33 at 12.) A plaintiff's claim for termination based on disability under the ADA fails if a plaintiff cannot show that his disability or accommodation request was the reason for his or her termination. *See Lober v. Brennan*, No. CV-18-2640-PHX-DMF, 2020 WL 1911218, at *6 (D. Ariz. Apr. 20, 2020) (granting summary judgment for the defendant where "[p]laintiff's termination could not have been and was not a result of Plaintiff's disability because the deciding officials were not aware of the disability"); *Marquez v. Glendale Union High Sch. Dist.*, No. CV-16-03351-PHX-JAT, 2018 WL 4899603, at *19 (D. Ariz. Oct. 9, 2018) (holding that the plaintiff could not meet her prima facie case of discrimination where the plaintiff could not show that the defendant knew that she had an impairment); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 54 n. 7 (2003) ("[I]f no part of the hiring decision turned on respondent's status as disabled, he cannot, *ipso facto*, have been subject to disparate treatment.").

Here, Plaintiff has not shown that Thompson knew of his medical condition or request for accommodation before Thompson made the decision to terminate Plaintiff's

position. Plaintiff testified that the first time he raised the issue of his medical condition with Thompson was in March 2019—after his termination and Thompson's decision to eliminate Plaintiff's position. (Doc. 34 ¶ 67.) Although Plaintiff informed Jennifer Reedy, an HR Business Partner, of his condition and accommodation request on April 26, 2018, she only signed off on Plaintiff's termination after Thompson had already made the decision. (*Id.* ¶ 70.) She did not make the decision to terminate Plaintiff herself. (*Id.*) Plaintiff provides no further evidence that Thompson knew of his condition or his accommodation request when he made the decision to terminate Plaintiff's position. In the absence of such evidence, Plaintiff's discrimination claim under the ADA must fail. Thus, the Court will grant GM's request for summary judgment on both of Plaintiff's ADA claims.

### C. ADEA Claim

"The ADEA prohibits employers from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age.'" *Katz v. Regents of the Univ. of California*, 229 F.3d 831, 835 (9th Cir. 2000) (quoting 29 U.S.C. § 623(a)(1)). "A plaintiff alleging discrimination under the ADEA may proceed under either of two theories: disparate treatment or disparate impact." *Palmer v. United States*, 794 F.2d 534, 536 (9th Cir. 1986).[4] In order to prevail on a disparate impact claim of age discrimination, "a plaintiff must prove that a challenged employment policy or practice, while facially neutral, has a disparate impact on certain employees" age 40 and over. *Id.* "It is not enough to simply allege that there is a disparate impact on workers or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Rather, they must identify a "specific test, requirement, or practice" that has an adverse impact on older workers. *Id.* "To prove causation, the plaintiff 'must offer statistical evidence of a kind and degree sufficient to

---

[4] The Court construes Plaintiff's ADEA claim as a disparate impact claim of employees over the age of 40. (*See* Doc. 1 ¶ 34 ("Upon information and belief, GM hiring and terminations of IT professionals has a disproportionate disparate impact on individuals over the age of 40.").)

show that the practice in question has caused the [plaintiffs' terminations] because of their membership in a protected group.'" *Beale v. GTE California*, 999 F. Supp. 1312, 1323 (C.D. Cal. 1996), *aff'd*, 141 F.3d 1173 (9th Cir. 1998) (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990)) (alterations original).

Here, Plaintiff has failed to prove causation through statistical evidence to establish his prima facie case of disparate impact. Plaintiff testified that 78.9% of employees terminated by the reduction in force at GM were 40 years old or older. (Doc. 34-1 at 63.) He provides no further data or expert to buttress that assertion. Plaintiff also provides no further data about the age composition of the other employees of GM. According to GM's evidence, before the reduction in force, GM employed approximately 8,914 IT employees in the United States. (*Id.* at 106.) Of all IT employees, 5,127 were over the age of 40—about 57% of IT employees. (*Id.*) GM's calculation shows that, in the reduction in force, GM released approximately 2,230 IT employees in the United States. (*Id.*) Of those employees released, 1,236 were over the age of 40—about 55% of the released IT employees. (*Id.*) Thus, a lower percentage of workers over the age of 40 were released than under the age of 40 in the reduction in force. Because Plaintiff provides no further analysis, he cannot prove a prima facie case for disparate impact. *See id.* (granting summary judgment for the employer because plaintiff failed to provide any data about the gender and age composition of the employees that remained after the reduction in force).[5] Accordingly, the Court will grant summary judgment for GM on Plaintiff's ADEA claim.

IV. **CONCLUSION**

Accordingly,

**IT IS ORDERED** granting GM's Motion for Summary Judgment. (Doc. 33.)

…

…

…

---

[5] Because the Court has concluded that Plaintiff has not made out a prima facie case for a disparate impact claim under the ADEA, the Court will not address GM's arguments that reasonable factors, other than age, made its decision reasonable.

1    **IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment and
2 close this case accordingly.
3    Dated this 16th day of May, 2022.

_____
Honorable Susan M. Brnovich
United States District Judge